# FACTORING AGREEMENT

THIS FACTORING AGREEMENT (the "Agreement") made and entered into this **09/07/2023** (the "Effective Date") by and between **RTS FINANCIAL SERVICE, INC.**, ("Factor"), a Kansas Corporation; and **AMERICAN PETROLEUM CARRIERS, L.L.C. DBA APC** ("Assignor"), a **Limited Liability Company** in the state of **Texas**.

## RECITALS

1. Assignor desires to sell to Factor all of its existing and future Accounts Receivable ("Accounts") arising from services performed in the regular course of Assignor's business; and

2. Factor desires to purchase certain of those Accounts, which Factor in its sole discretion deems acceptable for purchase, according to the terms and conditions provided in this Agreement.

In consideration of the above recitals and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## SECTION 1. DEFINITIONS

An "Account" means any right to payment for services rendered by or on behalf of Assignor. "Account Debtor" means a person or other entity, which is obligated to pay the Account.

## SECTION 2. PURCHASE OF ACCOUNTS

2.1 Assignor agrees to present to Factor for purchase all Accounts arising from the activities and services performed by Assignor.

2.2 Factor, in its sole discretion, may purchase such Accounts from Assignor as Factor determines to be acceptable. Assignor hereby agrees to sell, assign, transfer, convey and deliver to Factor, such Accounts as Factor shall elect to purchase. Assignor will notify each Account Debtor of the sale of its Account or Accounts to Factor and shall place a clear statement or legend, approved by Factor, on each such Account invoice, purchase order, or statement, stating that such Account has been sold and assigned, and is payable to Factor at its office at 9300 Metcalf Ave., Overland Park, Kansas 66212 or at such other address as Factor shall designate in writing. Factor shall become the absolute owner of all Accounts purchased hereunder. All remittances received by Assignor for payment of Accounts sold to Factor are the property of Factor, and Assignor shall hold such proceeds in trust for Factor, and shall immediately deliver to Factor, in the identical form, all payments received by Assignor on each such Account, together with all documents accompanying the remittance to Assignor. Assignor guarantees the timely payment of the monies and amounts represented by the assigned Accounts. Factor will not purchase Accounts representing services for which assignor did not in fact act as a Transportation Carrier.

2.3 ***Recourse Accounts***. All Accounts purchased by Factor hereunder are purchased with full recourse and are subject to repurchase as provided section 5.1, except Non-recourse Accounts as provided in section 2.4.

2.4 ***Non-recourse Accounts.*** "Non-recourse Account" shall mean and include any Account whose Account Debtor is rated as an "A", "B", or "C" by RTS Credit Service, Inc. on the Day Loaded. All Non-recourse Accounts are purchased without recourse to the Assignor and Factor assumes the risk of non-payment of a Non-recourse Account for the Covered Amount, so long as non-payment of the Account is due solely to an "Insolvency Event", and subject to any obligation of Assignor to repurchase such Account under section 5.2. "Day Loaded" means the calendar day on which the freight which is the subject of the Account was physically loaded for transport by Assignor. "Insolvency Event" means a petition for relief under the United States Bankruptcy Code by or against the Account Debtor within the earlier of (i) the payment due date of the Account or (ii) ninety (90) days from the date of the purchase of the Account by Factor from Assignor. "Covered Amount" means, as to any single Account Debtor, any amount in excess of $400 but not to exceed $4,000 per Account, and not to exceed in the aggregate $15,000 for all Accounts of such Account Debtor.

## SECTION 3. PURCHASE PRICE AND FACTORING CHARGE; SECURITY RESERVES

3.1 The purchase price for each Account purchased by Factor hereunder shall be the net amount of such Account, less the Factor's fee, which fee shall be an amount equal to **ONE AND TWO TENTHS PERCENT (1.20%)**[t] of such net amount. "Net amount" means the gross amount of the Account less any discount or allowance of any nature allowed to the Account Debtor.

---

[t] Throughout the term of this Agreement, Factor will review the US Prime Rate ("Prime") in effect as of the first business day of each calendar month and, in the event that the then current Prime changes, the parties hereby agree to a commensurate charge equal to the difference between the effective Prime in effect at the beginning of the month and a base Prime rate of 8.50 %. Notwithstanding anything contained herein and to the contrary, Prime will always be the greater of the base Prime rate of 8.50 % or the effective Prime at the beginning of the month, whichever is higher.

3.1.1 Notwithstanding the foregoing, the Factor's fee applicable to any Account on which **C.H. ROBINSON**, OR AN AFFILIATE TO ANY OF THE FOREGOING is the Account Debtor (the "QAP Account Debtors") shall be an amount equal to **ONE PERCENT (1.00%)** of the net amount of such Account, for all such Accounts paid within **90** days from the advance date. As required by section 2.1 of this Agreement, Assignor agrees to submit all Accounts including those on which the QAP Account Debtors are the Account Debtors to Factor. Factor shall at its sole discretion nevertheless in all cases retain the right to require repurchase by the Assignor of any such Account not paid within **90** days as provided in SECTION 5.

3.2 Payment of the purchase price to Assignor shall be made as follows:

(a) Upon the presentation by Assignor to Factor of documents reasonably acceptable to factor, for an Account approved for purchase by Factor, and provided no claim or dispute shall then exist with the Account Debtor as to the Account, Factor will advance to the Assignor the purchase price of the Account (as defined in Section 3.1 & 3.1.1), less a Security Reserve equal to **ZERO PERCENT (0.00%)** of the net amount of the Account.

(b) Upon Factor's receipt of full payment of the invoice for the Account from the Account Debtor, and provided Assignor shall not otherwise be in default in any respect under this Agreement, Factor will remit to the Assignor the Security Reserve in complete and full payment of the purchase price. In all cases, Factor will also retain its Factor's Fee payable under Section 3.1 or Section 3.1.1.

**SECTION 4. SECURITY INTEREST**

4.1 Assignor hereby grants to Factor as collateral, to secure all of the debts, liabilities and obligations of Assignor to Factor under this Agreement, including all costs and expenses incurred by Factor in connection with the enforcement of its rights under this Agreement, a security interest in the following property of Assignor: all assets, including, but not limited to, (a) all real and personal property, (b) all Accounts, wherever located or situated, and whether now existing or arising in the future, and whether now owned or at any time in the future acquired by Assignor, together with all proceeds and monies due or becoming due on such Accounts; all guaranties, insurance and security for such Accounts; all security reserves related to such Accounts; all of Assignor's rights and interests in the goods giving rise to such Accounts, and the rights associated with or related or pertaining to such goods, including without limitation the right of stoppage in transit and any and all related insurance, any items substituted therefore as replacements and all additions thereto; (c) all of Assignor's chattel paper, instruments, general intangibles, securities, contract rights and insurance associated with or related to the Accounts; (d) all equipment, inventory, and deposit accounts; and (e) all proceeds of any of the foregoing Accounts, property, rights and interests. Factor in its own name, or Factor's collateral agent in its name as the agent of Factor, may file financing statements and all amendments thereto describing as the collateral any or all of the foregoing collateral by any description Factor or its collateral agent deems appropriate in any jurisdiction or office Factor or its collateral agent deems appropriate to perfect Factor's security interest in foregoing collateral.

4.2 In the event of Assignor's breach of any warranty made in this Agreement or the Assignor's failure to observe or perform any of the provisions or obligations of this Agreement, Assignor shall be in default, and Factor may enforce payment and exercise any and all of the rights and remedies provided by Article 9 of the UCC as adopted and in force in the State of Kansas. In addition, upon default by Assignor, Factor shall also have the right to take all actions necessary to collect the Accounts directly from the Account Debtors, including, but not limited to, (i) in Assignor's name, or otherwise, demand, make claim for, sue for, collect, grant extensions, compromise, discharge, and get or give releases for any and all monies or funds due or to become due on Accounts, (ii) notify Account Debtors of Factor's security interest, regardless if Assignor has sold an Account to Factor related to such Account Debtor and otherwise notify and instruct Account Debtors, in Assignor's name, of the address, and procedures for making payments to Factor, and (iii) take all reasonable steps necessary to insure payment of such amounts and monies due, and do any and all things in Assignor's name necessary or proper to carry out the purposes intended by this Agreement. Factor's exercise of the foregoing rights shall be in the sole and absolute discretion of Factor, but Factor shall have no obligation to exercise any of the foregoing rights. Nothing contained in this Agreement shall in any way require Factor to initiate or become a party to any litigation or other legal proceedings.

**SECTION 5. REPURCHASE OF ACCOUNTS**

5.1 ***Repurchase of Recourse Accounts.*** All Accounts (other than Non-Recourse Accounts) are purchased by Factor from Assignor with full recourse. If Assignor breaches any warranty or otherwise violates or defaults on any of its obligations hereunder, or if any Account purchased by Factor hereunder is not paid in full on or before the earlier of (i) the payment due date of such Account, or (ii) ninety (90) days from the date of the purchase of the Account by Factor from Assignor,

then upon request by Factor, Assignor shall immediately repurchase such Account from Factor for an amount equal to the face amount of such Account (less any payments received by Factor on such Account from the Account Debtor), together with interest thereon at the rate of **ZERO%** per annum from the date of the assignment of such Account to Factor. Any security reserve held by Factor for such Account shall be released only in accordance with Section 3(b), and Factor shall in all events also be entitled to and shall retain its Factor's fee on the Account. Typically, Factor will require repurchase of any unpaid Account no later than **90** days after the Account invoice date, unless Factor, in its sole discretion chooses otherwise. However, in all cases, any unpaid Account must be repurchased by Assignor within **120** days after the Account invoice date.

5.2 ***Repurchase of Non-Recourse Accounts***. As to Non-recourse Accounts, and notwithstanding the occurrence of an Insolvency Event, Factor may in all cases require that the Assignor repurchase on demand (a) any Disputed Account the payment of which has been disputed by the Account Debtor (or by its successor); (b) any Account as to which Assignor has breached any warranty as to any Account as set forth in section 6.3; (c) any Account to the extent the non-payment of the Account does not qualify as a Covered Amount; and (d) all Accounts upon the occurrence of any default by Assignor of any of its obligations or warranties under this Agreement or upon the termination date of this Agreement. Upon demand by the Factor, Assignor shall immediately repurchase any such Account from Factor for an amount equal to the face amount of such Account (less any payments received by Factor on such Account from the Account Debtor), together with interest thereon at the rate of ZERO% per annum from the date of the assignment of such Account to Factor. Any security reserve held by Factor for such Account shall be released only in accordance with Section 3 (b), and Factor shall in all events also be entitled to and shall retain its Factor's fee on the Account. "Disputed Account" means and includes any Account as to which the Account Debtor or its successor in interest asserts or alleges any objection, claim or defense to payment, including but are not limited to, cargo claims, untimely pickup or delivery claims, pallet charges, claims for loading and unloading fees, incorrect payments, setoffs for claims of any kind by the Account Debtor against the Assignor including claims on other loads, deductions for driver's failure to make check-in calls, deductions for Assignor's lack of carrier insurance, and any and all other claims, defenses and setoffs of a commercial nature. Factor shall be under no obligation to determine the bona fides of the Account Debtor's claims, defenses or offsets with respect to a Disputed Account, and Assignor shall be obligated to immediately repurchase the Disputed Account under this section 5.2.

**SECTION 6. REPRESENTATIONS AND WARRANTIES**

Assignor represents, covenants, warrants and agrees as follows:

6.1 If Assignor is a corporation, that it is a corporation duly organized, existing and in good standing under the laws of the state of **Texas**; that the execution, delivery and performance of this Agreement are in every respect within its corporate powers and have been duly authorized by appropriate corporate action; and that this Agreement, when duly executed and delivered by the Assignor and the Factor, will constitute a legal, valid and binding agreement of the Assignor fully enforceable in accordance with its terms and conditions.

6.2 The Assignor's address set out in Section 14 of this Agreement is the address of Assignor's principal office and its sole place of business. Assignor shall give Factor immediate written notice of any change in the location of its principal office, the addition of any new place or places of business and their addresses, any name change or the addition of any name under which Assignor does business, or any change in the nature or status of Assignor's business or operations.

6.3 As to each Account purchased by Factor under this Agreement: (1) the Account is not yet past due, arose in the ordinary course of Assignor's business and represents a bona fide completed transaction; (2) the title of Assignor to the Account is absolute and subject to no assignment, claim, lien or security interest; (3) the Account, as shown on Assignor's books and records and on any invoices, bills of lading or statements, delivered to Factor is a legally enforceable debt owed by Account Debtor to Assignor in its full face amount; (4) no partial payment has been made by anyone on such Account; (5) the Account is not subject to any claims, either currently existing, or future claims that Factor can reasonably determine are forthcoming due to the filing of a bankruptcy or related action by any account debtor that may cause Factor to pay funds or return funds already received due to a preference action, fraudulent transfer, or otherwise; (6) no set off, credit, allowance, adjustment, counterclaim or defense to such Account exists or will exist and no agreement has been made or will be made with any person or entity under which any deduction or discount may be claimed on such Account; or (7) the Account is payable not more than thirty (30) days from the date of assignment of the Account to Factor.

6.4 Assignor shall execute any and all financing statements, Uniform Commercial Code forms or other documents or instruments which Factor deems necessary to protect its interest under this Agreement.

6.5 Assignor shall indemnify, defend and hold Factor harmless from and against any and all misrepresentations or breaches of warranty or other defaults hereunder by Assignor, and from any losses, expenses, attorneys fees or other costs incurred by Factor caused by or arising out of any such defaults or breaches of this Agreement by the Assignor and from any costs expenses or attorneys fees incurred by Factor in enforcing Factor's rights under this Agreement; from any

dispute or claim resulting in liability, loss, expense, cost or attorneys fees caused by or arising out of the rejection of any work performed or services rendered by Assignor; or from any alleged claim, dispute, action, defense or set off of every kind and nature asserted by any Account Debtor.

6.6 The Assignor shall not, without the express written consent of the Factor, release, compromise, settle or adjust any Account purchased hereunder, or grant any discounts, allowances or credits thereon.

**SECTION 7. POWER OF ATTORNEY**

7.1 In order to carry out this Agreement, and to avoid unnecessary notification of Account Debtors, Assignor irrevocably appoints Factor as Assignor's true and lawful attorney with the full power and right to: (a) invoice or bill for, collect, receive, and deposit to Assignor's bank accounts any and all amounts which may be due or become due to Assignor from Account Debtors, and to use Assignor's name for purposes of billing and collection of any and all amounts due; (b) receive, accept, open, dispose of and redirect any and all mail addressed to Assignor; (c) negotiate any checks received in payment of Accounts whether payable to Assignor or Factor or both, and endorse the name of Assignor on any checks or other evidences of payment or other instruments or documents that may come into the possession of Factor on Accounts purchased by Factor and on any invoices or other documents or instruments relating to any of the Accounts or relating to any collateral or security hereby granted by Assignor to Factor; (d) in Assignor's name, or otherwise, demand, make claim for. sue for, collect, grant extensions, compromise, discharge, and get or give releases for any and all monies or funds due or to become due on Accounts; (e) execute and deliver receipts or acknowledgments to Account Debtors for such amounts due which shall be binding upon Assignor and Factor; (f) notify Account Debtors of the sale of Accounts to Factor and notify and instruct Account Debtors, in Assignor's name, of the address and procedures for making payments on any Accounts that are sold to Factor or which constitute collateral hereby granted by Assignor to Factor; (g) take all steps necessary to insure payment of such amounts and monies due, and do any and all things in Assignor's name necessary or proper to carry out the purposes intended by this Agreement; (h) file financing statements and all amendments thereto, describing as collateral any or all of the collateral described in Section 4 hereof by any description Factor deems appropriate in any jurisdiction or office Factor deems appropriate to perfect its security interest in the collateral described in Section 4 hereof; and (i) initiate debit or credit entries through the Federal Reserve Automated Clearing House System (ACH) to any deposit account maintained by Assignor wherever located in order to satisfy any obligations of Assignor to Factor under this Agreement. It is understood that this power of attorney is coupled with an interest, and is irrevocable until all obligations of Assignor to Factor under this Agreement have been satisfied.

7.2 Exercise of the foregoing powers shall be in the sole and absolute discretion of Factor, but Factor shall have no obligation to exercise any of the foregoing powers. Nothing contained in this Agreement shall in any way require Factor to initiate or become a party to any litigation or other legal proceedings.

7.3 The Factor shall not, under any circumstances, or in any event whatsoever, have any liability for any error, omission or delay of any kind occurring in the collection, payment or settlement of any Account or of any instrument received in full or in part payment thereof or in dealing with any lien, security or guaranty of any such Account.

**SECTION 8. BOOKS, RECORDS AND FINANCIAL STATEMENTS**

All of Assignor's books, accounts, ledgers, correspondence, records and papers pertaining to all of the Assignor's Accounts and business shall be accurately and properly prepared and maintained by Assignor and shall disclose the sale of Accounts purchased by Factor. All such books, ledgers, accounts, records, correspondence and papers shall be opened by Assignor at all reasonable times for Factor's inspection, audit and copying. Upon request, but not more often than quarter annually, Assignor shall furnish Factor with financial statements including income statements and balance sheets showing Assignor's financial condition. Upon request, Assignor shall also provide Factor with annual financial statements acceptable to Factor.

**SECTION 9. ATTORNEY'S FEES AND EXPENSES**

If Factor retains the services of an attorney to enforce any obligation of Assignor to Factor under this Agreement, Factor shall be entitled to recover from Assignor all attorneys fees, court costs and expenses, regardless of whether or not an action is commenced.

**SECTION 10. GOVERNING LAW AND CONSENT TO JURISDICTION**

10.1 This Agreement is accepted and made in the state of Kansas and this Agreement and the rights of the parties hereunder shall be interpreted under and governed as to construction, enforcement and validity by the laws of the state of Kansas.

10.2 Factor and Assignor agree that any legal suit, action or proceeding arising out of or related to this Agreement shall be instituted, heard and resolved solely and exclusively in a State or Federal Court in or for Johnson County, Kansas. Factor and Assignor submit to the jurisdiction of the State and Federal Courts for Johnson County, Kansas for the purpose of deciding any questions, disputes or causes, arising under this Agreement, and in the event Assignor is not qualified to do business in the State of Kansas, the Secretary of State of the State of Kansas is hereby designated as Assignor's agent

for service of process for any actions commenced under or to enforce this Agreement in the State of Kansas, provided that a copy of any such process shall be mailed to Assignor in accordance with the notice provisions of this Agreement.

**SECTION 11. TERMINATION**

11.1 This Agreement shall have an initial term of twenty four (24) months from the Effective Date hereof (the "Original Term"), and shall automatically renew for successive periods of twenty four (24) months ("Renewal Periods"), unless sooner terminated as hereinafter provided. Assignor may terminate this Agreement as of the expiration of the Original Term or any Renewal Term by giving Factor prior written notice of its intention to so terminate; provided, however, that any presentation of Accounts by Assignor to Factor for funding after the termination date shall cancel any prior termination notice and renew this Agreement for another Renewal Period. Such notice shall be given by Assignor to Factor at least sixty (60) days, but not more than ninety (90) days, prior to the expiration of the Original Term or any Renewal Term. Factor may terminate this Agreement at any time upon thirty (30) days prior written notice to Assignor; provided however, that this Agreement shall terminate immediately, at the option of Factor, upon the insolvency of the Assignor or the filing of a petition in bankruptcy by or against the Assignor or upon any default or breach of this Agreement by Assignor. Assignor hereby acknowledges and agrees that Factor will incur significant time and expense setting up this financing relationship (the "Due Diligence Expenses"). In the event that Factor does not purchase any Accounts from Assignor under this Agreement for any reason out of the control of Factor (including, but not limited to, the inability of Assignor to completely terminate its relationship with another financing company), Assignor hereby agrees to pay Factor a fee equal to $5,000.00 to cover the Due Diligence Expenses.

11.2 All of the Assignor's covenants, warranties and agreements under this Agreement made to Factor, and all rights and remedies of the Factor under this Agreement, shall survive the termination of this Agreement and shall continue in full force and effect until all Accounts purchased hereunder are paid in full and all debts and obligations to of Assignor to Factor hereunder have been satisfied in full. Upon termination Assignor shall remain liable to Factor for any and all unpaid Accounts, and for all other amounts and monies as may be owed to Factor under the terms and conditions of this Agreement. Upon termination, any security reserve and any other funds or monies from any source whatsoever which would otherwise be owing to Assignor by Factor may be retained by Factor until such time as all obligations and debts of Assignor to Factor have been fully satisfied, and Factor's security interest provided in Section 4 hereof shall continue until all obligations of Assignor to Factor are paid in full. Factor shall have the right, in its sole discretion, to set off against the security reserve and any other sums owing to Assignor by Factor all obligations and debts of Assignor to Factor.

**SECTION 12. MODIFICATION, SEVERABILITY, SUCCESSORS AND ASSIGNS, ETC.**

This Agreement may be modified only by written instrument signed by the parties hereto. In the event that any one or more of the provisions contained in this Agreement should be held by any court of competent jurisdiction to be unenforceable, the holding or decision shall not affect or impair any of the other provisions of this Agreement. This Agreement supersedes all prior agreements between the parties, and shall bind the successors and assigns of Assignor and shall inure to the benefit of the successors and assigns of Factor. As used in this Agreement, the singular shall be deemed to include the plural and vice versa, and the neuter shall be deemed to include the masculine or feminine, and vice versa.

**SECTION 13. NO DELAY**

13.1 No delay or omission on the part of Factor in enforcing or exercising any right hereunder shall operate as a waiver of such right or any other right. The waiver by Factor of the breach by Assignor of any provision of this Agreement, or of Assignor's compliance with such provisions, shall not be construed as a waiver of any other breach or of the provision itself. No waiver or modification of the Agreement shall be chargeable against Factor unless in writing, signed by Factor and delivered by Factor to Assignor.

13.2 The waiver, compromise, discharge, extension or release by Factor, of any duty or obligation of any Account Debtor shall not reduce, diminish, limit, or restrict in any way Assignor's obligations and liabilities to Factor.

**SECTION 14. NOTICE**

Notices under this Agreement shall be in writing and mailed postage prepaid, registered or certified mail, return receipt requested, or sent by overnight delivery service, addressed to the addressees set forth below, or to such other address as either party notifies the other in writing. All such notices shall be effective upon receipt if delivered by hand or overnight delivery service; otherwise upon three (3) business days after the notice is placed in the U.S. Mail. Addresses for notices are as follows:

In the case of Assignor, to:

**AMERICAN PETROLEUM CARRIERS, L.L.C. DBA APC**
**3601 N WARE RD**
**MCALLEN, TX 78504**
**TEL: 9562125484**

In the case of Factor, to:

**RTS FINANCIAL SERVICE, INC.**
**9300 METCALF AVE**
**OVERLAND PARK, KS 66212**
**TEL: 800-860-7926**

**SECTION 15. COUNTERPARTS; FACSIMILE SIGNATURES**

This Agreement may be executed in one or more counterparts and by different signatories thereto, all of which counterparts, when taken together, shall constitute but one agreement. This Agreement may be validly executed and delivered by facsimile or other electronic transmission and any such execution or delivery shall be fully effective as if executed and delivered in person.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers, as of **09/07/2023**.

ASSIGNOR:
**AMERICAN PETROLEUM CARRIERS, L.L.C.**
**DBA APC**
**MC# 932604**

DocuSigned by:
By: LUIS TREVINO
71E88F2B63564E6...

LUIS ALBERTO TREVINO
Title: MEMBER/MANAGER

FACTOR:
**RTS FINANCIAL SERVICE, INC.**

By: ______________________________

Title: VICE-PRESIDENT

**BUNDLED PRICING PROGRAM ADDENDUM**
**To Factoring Agreement Dated 09/07/2023**

The below terms and conditions are hereby incorporated into the above referenced Factoring Agreement (the "Agreement") by and between **AMERICAN PETROLEUM CARRIERS, L.L.C. DBA APC** ("Assignor") and RTS Financial Service, Inc. ("Factor") effective as of **09/07/2023** (as amended, the "Agreement"):

1. Assignor hereby acknowledges and agrees that (i) the pricing in Section 3 and the attached Exhibit A of the Factoring Agreement (the "Bundled Pricing") is being provided pursuant to a bundled program between Factor, Assignor and Pilot Travel Centers LLC and its various subsidiaries ("Pilot") as separately agreed to by the parties (the "Bundled Agreement"); (ii) the Bundled Pricing is subject to Assignor not being in default of the Bundled Agreement, (iii) Factor may share the terms of the Agreement and any of Assignor's account information and data (including any data and opinions relating to Assignor's creditworthiness) with Pilot in addition to status of the underlying factoring contract, the first qualifying purchase of an Account resulting in a Factor's fee, and other account information as requested by Pilot, and (iv) Factor may rely on information otherwise available to Factor through its affiliate RTS Carriers Services, Inc. ("RTS Carrier Services") or correspondence from Pilot to determine if Assignor has defaulted on its commitments to qualify for the Bundled Pricing.

2. If Assignor defaults on any of its obligations to Factor or any of its obligations to Pilot required to qualify for Bundled Pricing, the compliant pricing as provided for in Exhibit A (the "Compliant Pricing") may be terminated by Factor at any time thereafter at Factor's sole discretion and the pricing and other terms provided herein shall be subject to the non-compliant pricing (the "Non-Compliant Pricing") as provided for in Exhibit A and such Non-Compliant Pricing shall remain in place throughout the remainder of the Agreement, or until otherwise modified by the parties in writing.

3. Assignor is working with Factor's affiliate RTS Carrier Services and desires to obtain fuel discounts, credit terms and other perks with Pilot. As a condition to obtaining the desired discounts and perks, Assignor hereby agrees to the following terms and conditions that shall apply at any point in time Assignor has a balance due to Pilot for any reason:

   a. Assignor hereby authorizes Carrier Services and/or Pilot to share with Factor all information regarding the status of Assignors account(s) including, but not limited to, if Assignor has defaulted in any manner on its payment obligations to Pilot and the current amount due ("Payment Default");

   b. In the event of a Payment Default, Pilot and Carrier Services shall have the immediate right to demand that Factor forward all funds (or a lessor amount if acceptable to Pilot) then due to Assignor under the Factoring Agreement directly to Pilot instead of Assignor until the Payment Default has been paid in full and Factor is hereby authorized to comply with these demands;

   c. All such advances made by Factor directly to Pilot as provided herein shall be deemed to have been disbursed in full to Assignor for purposes of calculating Factor's obligations to Assignor under the Factoring Agreement;

   d. Assignor hereby authorizes Factor to share any and all account information with Carrier Services and/or Pilot as requested including, but not limited to, information relating to the invoices submitted by Assignor to Factor, account status, current account balance, and account history; and

   e. The parties hereby acknowledge and agree that the fuel discounts, credit terms and other perks offered to Assignor can be immediately terminated at any time and for any reason upon written notice to Assignor by Factor, Carrier Services or Pilot.

4. RTS Carrier Services and Pilot are hereby added as third-party beneficiaries of this Agreement for purposes stated in this Agreement.

5. Except as provided for herein, all of the other terms, conditions, and provisions of the Agreement shall remain in full force and effect.

**AMERICAN PETROLEUM CARRIERS, L.L.C. DBA APC**

DocuSigned by:

By: LUIS TREVINO

71E88F2B63564E6...

Name: LUIS ALBERTO TREVINO

Title: MEMBER/MANAGER

Date: 9/8/2023

**RTS FINANCIAL SERVICE, INC.**

By: ______________________

Title: VICE-PRESIDENT

Date: **09/11/2023**

## EXHIBIT A

### Pricing Schedule

Upon Factor's review of the proceeding thirty (30) calendar days ("Review Period") on the first business day of the following month, and at Factor's sole discretion, shall determine if the combined balance of Accounts purchased from **Assignor** meets or exceeds a corresponding monthly minimum per calendar month ("Monthly Minimum"). If it is determined that the total combined balance of Accounts purchased is below a corresponding Monthly Minimum at the completion of the Review Period, the corresponding Factor's Fee in Section 3.1 or 3.1.1 shall be as follows in the table below, and such rate shall remain the effective rate for the duration of the following Review Period until Factor evaluates the Assignor's Monthly Minimum at the completion of any Review Period.

| Monthly Minimum Factor Amount | Compliant Pricing | Non-Compliant Pricing |
|---|---|---|
| $ 0.01-$100,000.00 | 2.00% | 2.50% |
| $ 100,000.01-$200,000.00 | 1.75% | 2.25% |
| $ 200,000.01- | 1.20% | 1.70% |

At the completion of any Review Period, the applicable Factor's Fee shall either remain effective, or shall be adjusted to, the pricing corresponding to the above Monthly Minimum and such pricing shall remain effective for the duration of the following Review Period until Factor evaluates the Assignor's Monthly Minimum at the completion of any Review Period.

Notwithstanding the foregoing, the Factor's Fee in Section 3.1.1 shall always be equal to the lesser of the corresponding Factor's Fee in the aforementioned table or ONE PERCENT (1.00%).

This Exhibit "A" is hereby incorporated and made part of the Factoring Agreement dated **09/06/2023** between Factor and Assignor as of **09/06/2023** (the "Effective Date").

**AMERICAN PETROLEUM CARRIERS, L.L.C. DBA APC**

DocuSigned by:

By: LUIS TREVINO

71E88F2B63564E6...

Name: LUIS ALBERTO TREVINO
Title: MEMBER/MANAGER

Date: 9/8/2023

**RTS FINANCIAL SERVICE, INC.**

By: ________________

Title: VICE-PRESIDENT

Date: **09/11/2023**

# GUARANTY

For valuable consideration and to induce **RTS FINANCIAL SERVICE, INC. ("RTS")** to enter into the Factoring Agreement dated **09/07/2023** ("the Factoring Agreement") with **AMERICAN PETROLEUM CARRIERS, L.L.C. DBA APC ("ASSIGNOR"),** I the undersigned, do hereby guarantee to **RTS**, its successors and assigns the full, prompt and complete performance by **ASSIGNOR** of all of the provisions, conditions, covenants and agreements contained in the Factoring Agreement, including the full and complete payment of all monies that become due thereunder to **RTS** by **ASSIGNOR** under the Factoring Agreement and any related guarantees associated with the Factoring Agreement and do hereby waive all notice of default by **ASSIGNOR** and notice of acceptance of this guaranty by **RTS**, and do hereby consent to any extension of time that may be given by **RTS** to **ASSIGNOR** of time of payment or performance. This guaranty is not limited to any particular period of time, but shall continue until all of the terms, covenants, and conditions of the Factoring Agreement and related guarantees have been fully and completely performed by **ASSIGNOR** and the undersigned shall not be released of any obligation or liability hereunder so long as there is any claim of **RTS** against **ASSIGNOR** arising out of the Factoring Agreement, or any third parties under any guarantees associated with the Factoring Agreement, that has not been settled or discharged in full. The undersigned waives any right to require **RTS** to proceed against **ASSIGNOR**, the account debtors or customers of **ASSIGNOR** or any other person, or to proceed against or exhaust any security or pursue any other remedy in **RTS'** power. Whether or not suit be initiated, the undersigned agrees to pay reasonable attorneys' fees and all other costs and expenses incurred by **RTS** in enforcing this guaranty and in any actions or proceedings arising out of or relating to the guaranty. To secure the undersigned's obligations to **RTS** under this Guaranty and to the extent permitted by applicable law, **RTS** reserves a right of setoff in any factoring accounts held by **RTS** relating to the undersigned. The factoring accounts are referenced in the Factoring Agreement(s), as amended, between the undersigned and **RTS**. This includes all accounts the undersigned currently holds and all accounts the undersigned may assign to **RTS** in the future. The undersigned authorizes **RTS** to charge or setoff all sums owing on the debt of this Guaranty against any and all such accounts, against any advances otherwise due to the undersigned on accounts purchased by **RTS** and against any funds held in the security reserve for the undersigned with respect to such accounts. The undersigned hereby grants to **RTS** a continuing security interest in all of the undersigned's assets, including, but not limited to, all equipment, inventory, all real and personal property, existing and hereafter arising accounts, accounts receivable and deposit accounts, and all proceeds thereof (the "Collateral"). **RTS** is hereby authorized to file all UCC financing statements and other documents which **RTS** deems necessary or appropriate to perfect its security interest in the Collateral. To the extent **ASSIGNOR** guarantees the obligations of a third party that results in a negative balance due by **ASSIGNOR** to **RTS** under the Factoring Agreement between **RTS** and **ASSIGNOR**, I hereby understand and agree that this guaranty shall also apply to those third party obligations and I shall be personally liable for the obligations of such third party under this guaranty to the extent **ASSIGNOR** is obligated to **RTS** under the respective Factoring Agreement and related guaranty. This guaranty shall be governed and construed in accordance with the laws of the state of Kansas. The undersigned hereby consents to the sole and exclusive jurisdiction of any state or Federal court within the state of Kansas in connection with the enforcement of this guaranty.

DocuSigned by:

LUIS TREVINO

71E88F2B63564E6...

LUIS ALBERTO TREVINO
3601 N WARE RD
MCALLEN, TX 78504

# CERTIFIED COPY OF RESOLUTIONS

(LLC)

**"RESOLVED**, that the Factoring Agreement dated **09/07/2023** between **AMERICAN PETROLEUM CARRIERS, L.L.C. DBA APC** ("this company") and **RTS FINANCIAL SERVICE, INC. ("RTS")** and all other agreements and documents connected therewith be, and the same hereby are, approved on the terms and conditions as set forth therein";

**"RESOLVED**, that any officer, manager or member of this company be, and he hereby is authorized and directed to enter into said agreement and all other agreements and documents connected therewith and to execute the same for and on behalf of this company on the terms and conditions set forth therein";

**"RESOLVED**, that any officer, manager or member of this company be, and hereby is authorized and directed to negotiate, agree upon, execute and deliver, from time to time, in the name of, and on behalf of, this company, such agreements, amendments, and supplements to said agreement or any other agreement or document connected therewith, documents, instruments, certificates, notices and further assurances and to perform any and all such acts and things as may be required by **RTS** in connection with said agreement or any other agreement or document connected therewith, or may to him seem necessary or proper to implement and effect complete consummation of said agreement or any other agreement or document connected therewith in all respects and the purposes set forth in these resolutions";

**"RESOLVED,** that these resolutions shall remain in full force and effect until all indebtedness and obligations arising out of said agreement and all other agreements and documents connected therewith shall have been paid and satisfied in full."

The undersigned, being all of the Members and Managers of **AMERICAN PETROLEUM CARRIERS, L.L.C. DBA APC** do hereby certify that the foregoing is a true and correct copy of the resolutions duly adopted at a meeting of the Members and Managers of **AMERICAN PETROLEUM CARRIERS, L.L.C. DBA APC**, a **Texas** limited liability company, duly called, noticed and held on **09/07/2023**, at which meeting there were at all times present and acting Members and Managers of the company; and that said resolutions are in full force and effect; and that the following is a true and correct list of all of the Members and Managers of **AMERICAN PETROLEUM CARRIERS, L.L.C. DBA APC**.

DocuSigned by:
LUIS TREVINO
71E88F2B63564E6

LUIS ALBERTO TREVINO, Member / Manager

Date: 9/8/2023